Anna Y. Park, CA SBN 164242
Sue J. Noh, CA SBN 192134
Rumduol Vuong, CA SBN 264392
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
255 East Temple Street, Fourth Floor
Los Angeles, CA 90012
Telephone:  (213) 894-1083
Facsimile:  (213) 894-1301
E-Mail:  lado.legal@eeoc.gov

Eric Yau, HI SBN 10087
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
300 Ala Moana Boulevard, Room 4-257
Honolulu, HI 96850
Telephone: (808) 541-3133
Facsimile: (808) 541-3390
E-mail: eric.yau@eeoc.gov

Attorneys for Plaintiff
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>   Plaintiff,<br><br> v.<br><br>PACIFIC FUN ENTERPRISES LLC d/b/a SNAPPERS SPORTS BAR AND GRILL, d/b/a SNAP-ETTE BEACH AND LIQUOR STORE, and Does 1-5 Inclusive,<br>   Defendants. | Civ. No. 17-00482 ACK-RT<br><br>SECOND AMENDED FINDINGS AND RECOMMENDATION TO GRANT PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT PACIFIC FUN ENTERPRISES LLC<br><br>The Honorable Rom Trader<br>United States Magistrate Judge |

SECOND AMENDED FINDINGS AND RECOMMENDATION TO
GRANT PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
<u>AGAINST DEFENDANT PACIFIC FUN ENTERPRISES LLC</u>

Plaintiff United States Equal Employment Opportunity Commission's

("EEOC") Motion for Default Judgment (ECF No. 14) came on for hearing on

November 15, 2018 at 9:30 a.m. before the Honorable Kevin S.C. Chang.

Attorneys Eric Yau, Esq. and Rumduol Vuong, Esq. appeared on behalf of

Plaintiff.  The Defendant Pacific Fun Enterprises LLC, d/b/a Snappers Sports Bar

and Grill, d/b/a Snap-pette Beach and Liquor Store ("Defendant" or "Snappers")

made no opposition, objection, appearance, or other communications.  The Court,

noting that default was entered previously, and after reviewing the written

submissions, the records and files in this case, and the applicable law, FINDS and

RECOMMENDS that Plaintiff's Motion be GRANTED for the reasons stated on

the record and as stated below.

## I.  <u>PROCEDURAL HISTORY</u>

On September 26, 2017, the EEOC filed its original complaint, alleging

violations of Title VII of the Civil Rights Act of 1964, as amended, and Title I of

the Civil Rights Act of 1991. (Pl.'s Compl., ECF No. 1). EEOC's Complaint

alleged that Defendant engaged in unlawful discrimination when it subjected

Charging Party, Jessica Root, and a class of similarly aggrieved female employees

("Claimants") to unwelcome physical and verbal sexual conduct which was

2

sufficiently severe or pervasive to adversely affect the terms and conditions of their employment and create a hostile work environment. *Id.* at ¶¶ 15-17. The EEOC further alleged that this hostile work environment became intolerable and caused many of the Claimants to be constructively discharged.  Further, Snappers subjected Claimants to unlawful retaliation when it reduced their work shifts, subjected them to unfavorable terms and conditions of employment, and/or terminated their employment for engaging in statutorily protected activities. *Id.*

On October 16, 2017, Mr. Darin Leong, Esq., of Marr Jones and Wang LLP, returned a waiver of service of summons on behalf of Snappers. (Waiver of Service of Summons, ECF No. 7-1). Snappers failed to file an answer or a motion under Rule 12 of Fed. R. Civ. P. by the deadline of December 5, 2017. (Pl.'s Mot. for Entry of Default, ECF No. 10). The Clerk of this Court entered the default on January 22, 2018. (Entry of Default, ECF No. 12). On September 27, 2018, the EEOC filed the instant Motion for Default Judgment. (Mot. for Default J., ECF No. 14). Snappers was served with a copy of the Motion for Default Judgment, but did not file an opposition or otherwise respond to the Motion. (Certificate of Service for Mot. for Default J., ECF No. 14-10).

## II. RELEVANT FACTS

A.     Background of Snappers

1.     Snappers was a Honolulu sports bar and grill providing alcoholic and non-alcoholic beverages and food to customers. (Def.'s Resp. to EEOC's Req. for Information, ECF No. 14-3).

2.     Snappers was owned and operated by Michael Wenzel and wife Colleen Wenzel. *Id.* There were approximately 20 – 25 employees. (Decl. of Jessica Root at ¶ 4, ECF No. 14-4; Decl. of Nicole Garrett at ¶ 4, ECF No. 14-5; Decl. of Michele Edwards at ¶ 5, ECF No. 14-6; Decl. of Adrienne Akin at ¶ 5, ECF No. 14-7).

B.     Owner Michael Wenzel Sexually Harassed Female Workers

3.     Michael Wenzel was involved in the day to day operations of Snappers and was responsible for setting the servers' schedules, telling servers which customers to serve, and handling employee complaints, discipline, hiring and termination.  (Decl. of Jessica Root at ¶¶ 2, 4, ECF No. 14-4; Decl. of Nicole Garrett at ¶ 3, ECF No. 14-5; Decl. of Michele Edwards at ¶¶ 7-8, ECF No. 14-6; Decl. of Adrienne Akin at ¶¶ 4,7, ECF No. 14-7).

4.     Ms. Root began working as a wait staff/server at Snappers in December 2010 and was responsible for greeting customers, taking and delivering

food and beverage orders, bussing, cleaning and closing the bar. (Decl. of Jessica Root at ¶¶ 2-3, ECF No. 14-4).

5. Michael Wenzel's sexist, derogatory, degrading and offensive name-calling occurred both during and after work hours several times a month throughout Ms. Root's four (4) years of employment at Snappers. *Id.*

6. Since at least 2011, Michael Wenzel regularly made inappropriate comments of a sexual nature to Jessica Root.

7. Beginning on or around February 2011, Michael Wenzel sexually harassed Ms. Root when he called her a "slut" and "whore." *Id.* at ¶ 6.

8. Michael Wenzel would occasionally comment on how big Ms. Root's buttocks were. *Id.*

9. He has told Ms. Root that he had a dream the night before of Ms. Root having sex. *Id.*

10. He has also once told Ms. Root that he and Colleen Wenzel just got done having sex on a boat, and that he realized the sandwich was between them when he got hungry. *Id.* Michael Wenzel merely laughed and walked off when Ms. Root asked him not to tell her those things. *Id.*

11. Ms. Root complained to Michael Wenzel almost on a monthly basis. She told him that she did not appreciate the name-calling and his conduct, and that

his comments were inaccurate.  Michael Wenzel never apologized and would just shrug off and turn away.  *Id.* at ¶ 7.

12.    Michael Wenzel regularly made sexual comments about other female workers and patrons to Ms. Root. *Id.* at ¶ 8.

13.    Ms. Root recalls a time when she went to the Irish Rose Saloon where Michael Wenzel and Kitchen Manager Ms. Ashley Harris were seated. *Id.* at ¶ 9. Michael Wenzel spoke of his sexual fantasies about Ms. Harris, the size of her breasts and buttocks, including how he wanted to "do" her by "wrapping her legs around him and fuck the shit out of her." *Id.*  Offended and uncomfortable, Ms. Root immediately told Michael Wenzel he could not be saying such things about Ms. Harris and women in general because it was illegal. *Id.*  Michael Wenzel simply smirked with invincibility. *Id.*

14.    On or about September 2013, Michael Wenzel ripped off Ms. Root's bikini top at a work event at the bar in front of at least 50 patrons.  *Id.* at ¶ 11.

15.    Michael Wenzel also harassed other female workers.

16.    Michele Edwards worked as a server at Snappers in August 2015. (Decl. of Michele Edwards at ¶ 2, ECF No. 14-6). She directly worked with Michael Wenzel three or four times per week. *Id.* at ¶ 9.

17.    Michael Wenzel would tell Ms. Edwards that her shorts were not short enough and that her shirts were not cut enough to reveal skin, almost on a daily

basis. *Id.* He would tell Ms. Edwards that he had scissors in the back office and he could help cut her shirts. *Id.*

18.     Ms. Edwards felt embarrassed and scared because there was nobody else in the back office and there were no cameras there. *Id.*

19.     On a weekly basis, Michael Wenzel also told Ms. Edwards that she would receive better tips and shifts if she dressed more provocatively and flirted with his friends. *Id.* at ¶ 16.  He would say things like "wear shorter shorts, that is the only way you can make more tips."  He threatened that if Ms. Edwards did not dress in a certain way or flirt with customers, she would not get the shifts that she wanted. *Id.* Ms. Edwards complied by wearing shirts that were cut.  *Id.*

20.     Michael Wenzel would also regularly tell other servers, including Nicole Garrett, to wear shorter shorts and flirt with customers to receive higher tips.  He would exclaim that "the breasts are out" in front of patrons, almost on a daily basis. *Id.* at ¶ 10; (Decl. of Nicole Garrett at ¶ 6, ECF No. 14-5).

21.     Michael Wenzel would also inappropriately touch Ms. Edwards and would make inappropriate comments of a sexual nature.  (Decl. of Michele Edwards at ¶ 11, ECF No. 14-6).

22.      Ms. Edwards recalls a time when Michael Wenzel asked her to talk to him in the back office. *Id*. He talked really close to her face and put his hand around her waist. *Id*.

23.     Michel Wenzel would regularly put his hand on Ms. Edwards' lower back and spoke uncomfortably close to her face, almost on a weekly basis. *Id.* at ¶ 12.  While doing so, he would say things like "This is Hawaii, it's okay for me to kiss you and touch your back, I am just friendly," and "I like to kiss your cheeks." *Id*. Michael Wenzel would do this at the restaurant within view of customers and Ms. Edwards' coworkers, which made her feel very embarrassed. *Id*.

24.     Michael Wenzel acted flirtatious when his wife was not around or when he was drinking and would call Ms. Edwards "baby" or "honey" and even said "Honey, just come into the back office for a bit, I can make it to you." *Id*.

25.      On or about March 2016, Ms. Edwards wore sparkly eye shadow and Michael Wenzel told her that "maybe you could make more money if you were a stripper because that's the only thing you have going for you." *Id*. at ¶ 15.

26.     When Ms. Edwards complained to Michael Wenzel about his behavior 2-3 months before her termination, he merely continued with the harassment and she eventually lost most of her shifts. *Id*. at ¶ 18.

27.     Michael Wenzel also reached into Ms. Adrienne Akin's skirt and inappropriately touched her on or around the end of February 2016, at a St. Patrick's Day event at work. (Decl. of Adrienne Akin at ¶ 9, ECF No. 14-7).

C.    <u>Owner Michael Wenzel Tolerated Sexual Harassment of Female Workers by His Friends and Patrons</u>

28.    In addition to sexually harassing female workers himself, Michael Wenzel readily enabled his friends and patrons to sexually harass female workers and refused to address sexual harassment when his workers complained. (Decl. of Michele Edwards at ¶ 13, ECF No. 14-6).

29.    On weekly pool nights, Ms. Edwards complained to Michael Wenzel that customers were touching her and he told her to deal with it on her own. *Id.* Michael Wenzel even admonished her for complaining by saying "don't tell me what the customer said or did to you; I don't care you handle it." *Id.*

30.    On one occasion, Michael Wenzel's friend grabbed Ms. Edwards aggressively in front of Michael Wenzel, and he merely laughed. *Id.*

31.    In September or October of 2015, Michael Wenzel's friend was speaking rudely to Ms. Edwards and when she tried to walk away, that friend grabbed Ms. Edwards' buttocks, pulled her closer to him, grabbed her breast, pet her hair, and then hit her buttocks again as she left his grasp. *Id.* at ¶ 14.

32.    Michael Wenzel saw this occur but continued to drink with his friends instead of intervening. This interaction made Ms. Edwards feel very embarrassed and uneasy. *Id.*

33.    Ms. Garrett experienced similar inaction when she complained of harassment to Michael Wenzel. (Decl. of Nicole Garrett at ¶ 8, ECF No. 14-5).

While working at Snappers, Ms. Garrett was propositioned for sex and harassed by patrons on a daily basis. *Id.* Both Michael Wenzel and Colleen Wenzel were aware of this, but would laugh about it. *Id.*

34.    When a customer offered Ms. Garrett money to act in a pornographic film, Michael Wenzel laughed after she complained to him. *Id.*

35.    When a patron hugged Ms. Garrett after paying his bill, the patron groped Ms. Garrett's buttocks. *Id.* When Ms. Garrett spoke to Michael Wenzel about how offended she was, Michael Wenzel simply rolled his eyes and said "What am I supposed to do about it?" *Id.*

D.    <u>Supervisor Troy Wenzel Sexually Harassed Female Worker</u>

36.    Troy Wenzel, Michael Wenzel's son, was as a Supervisor at Snappers and sexually harassed a female worker on a regular basis. (Decl. of Nicole Garrett at ¶ 3, ECF No. 14-5).

37.    Troy Wenzel would always stand in the doorway close to where the servers would drop off dirty dishes and made them maneuver sideways around him to drop off the dishes. *Id.*  This gave him the opportunity to stare at them longer. *Id.*

38.    In addition, Troy Wenzel frequently made comments that made Ms. Garrett feel very embarrassed and uncomfortable. *Id.* at ¶ 10. Further, Troy Wenzel

stared or leered at Ms. Garrett on a weekly basis. *Id.* This made Ms. Garret feel uneasy, uncomfortable, and gross. *Id.*

39.    Troy Wenzel made comments about Ms. Garrett's breasts (and about breasts in general) and on the appearance of other servers, and asked about her sexual experiences, almost on a daily basis. *Id.* Ms. Garrett was further embarrassed because he said them around other servers and cooks. *Id.*

40.    Troy Wenzel once engaged in a conversation with a cook comparing the breast size of two servers and asked for Ms. Garrett's opinion. *Id.*

41.    Ms. Garrett consistently told Troy Wenzel his comments about her breasts and the appearance of other servers were inappropriate and that he needed to stop but he just simply continued. *Id.* at ¶ 11.

E.    <u>Snappers Retaliated Against Employees for Complaints Against Michael Wenzel</u>

42.    Snappers routinely retaliated against employees who complained about the sexual harassment by giving them fewer shifts or terminating them outright.

43.    On or around February 28, 2015, Michael Wenzel had been drinking at work.  He was harassing and abusing Ms. Root, including yelling at her.  (Decl. of Jessica Root at ¶ 12, ECF No. 14-4).

44.    Michael Wenzel then falsely accused Ms. Root of calling his daughter a "whore." *Id.*

45.    Michael Wenzel stated that Ms. Root was "done." *Id.*

46.    Ms. Root was offended and distressed over hearing the derogatory and sexist comments and asked Michael Wenzel not to utter these things in the work place. *Id*

47.    In retaliation against Ms. Root for opposing the discrimination and harassment, Michael Wenzel responded:  "I'm cleaning house," which meant that he was terminating Ms. Root's employment.  *Id.*

48.    At approximately 4:00 a.m. on March 1, 2015, Ms. Root received a text message and email from Snappers' online scheduling system, *Schedulefly*, that she had been removed from her shifts for the following week.  She later received notice of her termination via email from Michael Wenzel. *Id.*

49.    Similarly, in response to Ms. Edwards' complaints to Michael Wenzel about his inappropriate sexual harassment, Snappers ceased contacting Ms. Edwards about her schedules 2-3 months later, effectively ending her employment. (Decl. of Michele Edwards at ¶¶ 18-20, ECF No. 14-6).

50.    Moreover, Michael Wenzel would cut shifts when female workers complained about being forced to wear cut up shirts and short shorts.  On one occasion, when Ms. Garrett wore a shirt to work that was not cut up because she felt uncomfortable exposing too much skin, her hours were reduced the following week. (Decl. of Nicole Garrett at ¶ 6, ECF No. 14-5).

51.    Ms. Garrett later got better shifts when she wore cut shirts. *Id.*

F.    <u>Female Workers Were Constructively Discharged When They Could No Longer Tolerate the Sexual Harassment</u>

52.    Ms. Garrett left employment in November 2016 after she could no longer tolerate the indifference that Michael Wenzel had when she complained about how the patrons behaved, and how he would always ask her to wear revealing shirts. (Decl. of Nicole Garrett at ¶ 12, ECF No. 14-5).

53.    Ms. Garrett could no longer tolerate Troy Wenzel's frequent references to her breasts and his leering at her body parts.  Troy Wetzel's harassment made it difficult to go to work. *Id.*

54.    Similarly, Ms. Akin left Snappers as soon as she discovered that Michael Wenzel had reached into her skirt and touched her inappropriately. (Decl. of Adrienne Akin at ¶ 10, ECF No. 14-7).

G.    <u>All Claimants Experienced Pain and Suffering from Snappers' Inaction Over Sexual Harassment and Subsequent Retaliation</u>

i.   <u>Jessica Root</u>

55.    Despite suffering from the abusive work environment, the cost of living and maintaining two jobs in Hawaii prevented Ms. Root from obtaining counseling because it was expensive, even though she believed that counseling or treatment would have helped tremendously in coping with the humiliation and emotional distress. (Decl. of Jessica Root at ¶ 16, ECF No. 14-4).

56.    Ms. Root found it difficult to share and discuss with friends and family her experiences of discrimination, harassment and retaliation at Snappers, because she was embarrassed and ashamed of the situation.  *Id.*

57.    In addition, Ms. Root did not date much while employed at Snappers and shortly thereafter, so she did not have many relationships. *Id.* at ¶ 17.

58.    Ms. Root avoided dating because of the way that Michael Wenzel mistreated her.  She felt as though she should not be dating because she was constantly being portrayed as a slut by Michael Wenzel. *Id.*  While his statements were false, Ms. Root felt they were enough to hurt her self-esteem and any hopes of a serious relationship in the future. *Id.*

59.    The longer Ms. Root worked, the more she loathed her job. *Id.*

60.    However, because of the high cost of living in Hawaii and the limited job openings, it was necessary for Ms. Root to continue working at Snappers, her second job, in order to afford her rent and survive until she could find another position with similar hours. *Id.*

61.    Every day at Snappers was intolerable as Ms. Root was subjected to discrimination and harassment at any given moment. *Id.*  Ms. Root knew that she was seen as a "slut" or a "whore" because that was how Michael Wenzel talked about her to his family and other staff and patrons. *Id.*

62.    Michael Wenzel's harassment resulted in relationship issues with her boyfriend because he was exposed to those lies.  *Id.*  Ms. Root experienced great anxiety not only while employed but after being fired by losing sleep over her ordeal at Snappers. *Id.* at ¶ 18.   Ms. Root has had recurring nightmares and her emotional distress is due in part to having to revisit the ordeal by participating in the EEOC suit. *Id.*

63.    At the time, Ms. Root was not fully aware of the extensive emotional damage and harm that Michael Wenzel had inflicted upon her. *Id.*

64.    The level of anxiety that Ms. Root experiences leads her to believe that the emotional damage and harm is permanent or will remain with her indefinitely. *Id*.

ii.    Nicole Garrett

65.    Ms. Garrett experienced sleeplessness, anxiety, stress, depression, humiliation, loss of self-esteem, and fatigue because of her experience at Snappers. (Decl. of Nicole Garrett at ¶ 13, ECF No. 14-5).  She surfed less over time and wanted to hide her body. *Id.*

66.    When Ms. Garrett stopped getting the premium shifts, she had to tolerate more unwelcome advances in order to make more tips to afford living in Hawaii, which also caused her a lot of stress. *Id.*

67.    Ms. Garrett's employment took a toll on her emotionally. *Id.*

68.     Although some of the symptoms have become less severe over time, Ms. Garrett needs to see a therapist to treat depression and anxiety which was due in part to how she felt stuck at Snappers because she needed the income. *Id.*

69.     Ms. Garrett was so rattled that she needed to reset her brain after she left.  Thus, she took a job at a preschool to feel better about herself.  *Id.* at ¶ 14.

### iii.    Michele Edwards

70.     Ms. Edwards' employment at Snappers caused her great stress and anxiety. (Decl. of Michele Edwards at ¶ 21, ECF No. 14-6). At home, she would experience anxiety attacks when she has flashbacks of how Michael Wenzel would touch her, and how patrons sexually harassed her. *Id.*

71.      Ms. Edwards' employment at Snappers harmed her personal relationships as she broke up with her long-term boyfriend because he wanted her to quit.  He disapproved of the cut up shirts and shorts she wore to work. *Id.*

72.     Ms. Edwards felt guilty for wearing provocative clothing at work. Her guilt caused her to have insomnia and anxiety attacks. *Id.*

73.     Ms. Edwards also experienced regular sleeplessness, humiliation, emotional distress and loss of self-esteem. *Id.* at ¶ 22.  The sleepless nights became a widespread occurrence, almost every time she worked at nights. *Id.*

74.     Due to the sleeplessness, Ms. Edwards' academic career took a toll. She was unable to focus in class and eventually lost passion for her studies. *Id.*

75.    Ms. Edwards regularly felt that she did not have a way out of the mess that she put herself in and felt she could not express her concerns to anyone due to the shame and humiliation. *Id.*  She felt an overwhelming sense of guilt and shame for allowing the treatment to happen. *Id.*  She started to believe that it was all her fault, that she should not have dressed provocatively or allowed Michael Wenzel and the patrons to touch and talk to her that way. *Id.*

76.    Ms. Edwards eventually developed an eating disorder. *Id.* at ¶ 23. She ate a lot of the fried and fatty food and gained twenty pounds, which was a far cry from when she was eating healthy foods and was active in hiking, playing volleyball and going to the gym. *Id.* at ¶ 23.

77.    Ms. Edwards began seeing a therapist because she could not work through the stress and anxiety on her own. Id. at ¶ 24.

78.    As this was her first job, Ms. Edwards assumed that this type of workplace environment was normal.  She thought she needed to please men in order to be successful. *Id.*

      iv.    <u>Adrienne Akin</u>

79.    Ms. Akin experienced sleeplessness, anxiety, stress, depression, humiliation, loss of self-esteem, and fatigue because of Michael Wenzel's offensive touching. (Decl. of Adrienne Akin at ¶ 12, ECF No. 14-7).

80.     The traumatic experience ruined her interest in bartending. *Id.*  Ever since Ms. Akin left Snappers, she has never been able to hold a bartending job because it reminds her of what Michael Wenzel did. *Id.*  She can no longer trust the people she works with. *Id.*

81.     Ms. Akin noted that she is not the same person. She works a lot to deal with the emotional distress from what Michael Wenzel did to her. *Id.*

82.     Ms. Akin's employment at Snappers took a toll on her emotionally. She needed to reset her brain after she left, so she left Hawaii in or around July 2016 to return to Tennessee, but she is still emotionally affected. *Id.* at ¶ 13.

83.      Initially, Ms. Akin did not realize how much it affected her, but when she lost interest in bartending and stopped doing things that she used to love doing (going out, drinking, and meeting up with friends), she began to see how Michael Wenzel's offensive touching has affected her. *Id.*

84.     The incident makes Ms. Akin think less of herself because she feels she could have done something different to avoid giving Michael Wenzel the chance to touch her inappropriately. *Id.*

85.     Ms. Akin does not go out anymore because she does not want to be in a situation like that ever again.  She believes that not going out altogether is one way of eliminating the possibility of the re-occurrence of Michael Wenzel's inappropriate touching in any context. *Id.*

## III.  DISCUSSION

A.    Legal Standard

1.    Pursuant to Rule 55(a) of Fed. R. Civ. P., a party may seek default when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend."

2.    A district court has discretion to grant a party's motion for default judgment. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). In *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986), the Ninth Circuit noted a court may consider the following seven factors in exercising its discretion on whether to grant a motion for default: "(1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying Federal Rules of Civil Procedure favoring decisions on the merits."

3.    In considering a motion for default judgment, "[t]he general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987); *see also Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977) (holding that as factual allegations are

accepted as true, default therefore establishes liability, leaving open only the issue of damages).

B.     The *Eitel* Factors Favor Entry of Default Judgment

    1.   The Possibility of Prejudice to the Plaintiff Favors Default Judgment

    4.     EEOC and Claimants will be prejudiced if default judgment is not entered against Snappers.  Here, Snappers failed to answer.  Thus, the Claimants "will [ ] be without recourse for recovery" and left without a remedy unless the Court grants the motion for default judgment. *PepsiCo, Inc. v. Cal. Security Cans,* 238 F.Supp.2d 1172, 1177 (C.D. Cal. 2002). *E.E.O.C. v. Trimbo, Inc.,* No. 06–6141 PVT, 2009 WL 733888, at *3 (N.D. Cal. Mar. 17, 2009).

    2.   The Merits of Plaintiff's Claims and the Sufficiency of the Complaint Favor Default Judgment

    5.     The second and third *Eitel* factors, the merits of the substantive claims and the sufficiency of the complaint, weigh in favor of the Court's entry of default judgment.  These two factors require that the EEOC "state a claim on which the [plaintiff] may recover." *PepsiCo, Inc.*, 238 F. Supp. 2d at 1175.  Indeed, the Complaint establishes the EEOC's claims in sufficient detail and provides clear support for those claims.  Thus, these two factors have been met.

a. <u>Complaint Sufficiently Pled Liability for Hostile Work Environment Claim</u>

6.     As stated by the Ninth Circuit in *EEOC v. Prospect Airport Servs.*, 621 F.3d 991, 997-9 (9th Cir. 2010), a prima facie case of hostile work environment requires a plaintiff need only establish that the harassment was: 1) based on sex; 2) unwelcome; 3) sufficiently severe or pervasive; and 4) that the employer is liable for the harassment.

7.     In the instant action, the Complaint sufficiently alleged that Owner Michael Wenzel subjected Ms. Root to regular and repeated sexual harassment when he called her a "slut" and "whore", ripped her bikini top in front of patrons, told Charging Party that he had dreams about Charging Party having sex, told her about sex acts with others, made lewd and degrading comments of a sexual nature about other female employees' breasts and buttocks. (Pl.'s Compl. at ¶ 15a, ECF No. 1). The harassment was not confined to Ms. Root, for the Complaint further alleged that Michael Wenzel told a female employee that he fantasized having sex with her, tried to kiss the employee, and required female employees to wear cut up shirts and shorter shorts to reveal more "skin." *Id.* at ¶ 15b. The Complaint also alleged that other management officials and patrons subjected female employees to similar harassment including making frequent sexual comments; unwanted touching of female employees' arms, breasts, and buttocks; and leering and brushing against women's bodies. *Id.*

21

8.      The Complaint further contains sufficient allegations for the Court to find that the comments and conduct by Michael Wenzel, Troy Wenzel and Snappers patrons were unwelcome.  Specifically, Ms. Root objected to the comments and complained to Michael Wenzel about how the sexual harassment offended, distressed and humiliated her. *Id.* at ¶ 15a. The Complaint alleged that the Claimants were offended by the sexually offensive and egregious conduct and reported the repeated sexual harassment to Michael Wenzel who simply shrugged it off and told the Claimants to "handle it on [her] own." *Id.* at ¶ 15c.

9.      The factual allegations in the Complaint establish that Michael Wenzel, Troy Wenzel, and Snappers' patrons' conduct was pervasive.  They occurred on numerous instances, almost on a daily basis. *Id*. at ¶ 15d.

10.     Lastly, the Complaint contains sufficient factual allegations that Snappers is liable for the hostile work environment as an employer. In *Ellerth*, the Supreme Court stated that if the harasser is a supervisor with immediate authority over the employee, the employer is presumptively liable. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998). Indeed, where the harasser is of a sufficiently high rank to be the employer's proxy, the employer is vicariously liable for the harassment. *Id.* at 758.

11.     Here, the Complaint alleged that Snappers' owner, director, agent and/or alter ego Michael Wenzel subjected Ms. Root and other female workers to

and was involved in the sexual harassment and failed to take reasonable steps to stop the sexual harassment when the workers complained. (Pl.'s Compl. at ¶ 15a-b, ECF No. 1).

12.    The Court finds that the Complaint sets forth a prima facie claim for sexual harassment on the part of Defendant's owner and management.

b.    <u>Complaint Sufficiently Pled Liability for Retaliation Claim</u>

13.    Under section 704(a) of Title VII, it is an unlawful employment practice for an employer to retaliate against an employee for opposing or complaining of an unlawful employment practice, or assisting in another's opposition or complaint. "To make out a prima facie case of retaliation, an employee must show that (1) [s]he engaged in a protected activity (2) [her]employer subjected [her] to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson,* 217 F.3d 1234, 1240 (9th Cir. 2000).

14.    A plaintiff pursuing a retaliation claim must still prove that the plaintiff's participation in the protected activity was the but for cause of the adverse action. *See Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 359-361 (2013).

15.    "[A]n employer's retaliatory conduct in response to an employee's complaint of sexual harassment, a protected activity, is actionable under Title VII's

antiretaliation provisions." *Davenport v. Bd. of Trs. of State Ctr. Cmty. Coll. Dist.,* 654 F. Supp. 2d 1073, 1087 (E.D. Cal. 2009); *see also Elvig v. Calvin Presbyterian Church,* 375 F.3d 951, 965 (9th Cir. 2004).

16.     Here, the Complaint alleges sufficient facts showing that the female workers engaged in protected activities when they opposed the unlawful sexual harassment by complaining and requesting that they be stopped. (Pl.'s Compl. at ¶ 16, ECF No. 1). Snappers subjected them to an adverse employment action when it reduced the their shifts and/or terminated their employment. *Id.*

c.     Complaint Sufficiently Pled Liability for Constructive Discharge

17.     Constructive discharge occurs when working conditions deteriorate because of discrimination to the point where it becomes sufficiently egregious and extraordinary to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job and to serve his or employer. *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (quoting *Penn. State Police v. Suders,* 542 U.S. 129, 142 (2004)).

18.     The Complaint sufficiently alleged the Claimants were constructively discharged when they resigned because of the intolerable working conditions created by the hostile work environment. Snappers knew or should have known about the harassment.  Michael Wenzel and other management witnessed the

24

harassment, engaged in it, and Ms. Root and other Claimants complained, but Snappers failed to take remedial action. (Pl.'s Compl. at ¶ 15e, ECF No. 14).

19.    In sum, the Complaint sufficiently pled that Snappers is vicariously liable for the sexual harassment that Michael Wenzel and Troy Wenzel inflicted on the Claimants, and for failing to take effective remedial action when the Claimants complained about sexual harassment by the bar's patrons.

20.    The Complaint and evidence further show that the claim for harassment, retaliation and/or constructive discharge have merit. Thus, both of these *Eitel* factors are satisfied and weigh in favor of default judgment.

3. <u>The Sum of Money at Stake Favors Default Judgment</u>

21.    "Since the district court has "wide discretion in determining the amount of statutory damages to be awarded," the amount of money requested does not weigh against the entry of default judgment." *Sennheiser Elec. Corp. v. Eichler,* No. CV12-10809 MMM(PLAx), 2013 WL 3811775 at *5 (C.D. Cal. Jul. 19, 2013); *see also Phillip Morris USA, Inc. v. Castworld Products, Inc.,* 219 F.R.D. 494, 500 (C.D. Cal. 2003) (finding that amount at stake weighed in favor of default judgment as $2,000,000 in statutory damages was warranted).

4. <u>There is Little Possibility of Dispute Concerning the Material Facts which Favors Default Judgment</u>

22.    The fifth *Eitel* factor considers the possibility of dispute as to any material facts in the case. "Upon entry of default, all well-pleaded facts in the

complaint are taken as true, except those relating to damages." *See Televideo Sys.,* 826 F.2d at 917-18. Here, there is no dispute as to the material facts as the facts in the complaint are taken as true, and the complaint sufficiently pleads harassment, retaliation and/or constructive discharge against Snappers.

      5.    <u>Default Was Not the Result of Excusable Neglect</u>

23.    There is no evidence that would support the argument that Snappers' failure to defend this action was from excusable neglect. Snappers was properly served with complaint, notice of the lawsuit, and motion for entry of default. (Decl. of Trial Attorney Eric Yau at ¶ 8, ECF No. 14-2).

24.    Given this fact and the fact that Snappers did not appear, there is little likelihood that its failure to appear is the result of excusable neglect. *See ESET, LLC v. Bradshaw,* No. 10–CV–1369 JLS (JMA), 2011 WL 2680497, at *2 (S.D. Cal. Jul. 8, 2011); *Virgin Records Am., Inc. v. Cantos,* Civil No. 06cv915-L(CAB), 2008 WL 2326306, at *3 (S.D. Cal. June 3, 2008) (concluding that there was no potential that defendant's default was due to excusable neglect when defendant was served with notice of complaint and application for default judgment). Consequently, this factor favors the entry of default judgment.

      6.  <u>The Policy Favoring Decisions on the Merits Does Not Outweigh Factors Favoring Default Judgment</u>

25.    The last *Eitel* factor, favoring deciding a case upon the merits, does not rigidly require a decision on the merits when the defaulting party's own

behavior prevents such a decision. *See ESET,* 2011 WL 2680497, at *2, *3 (citing *Rio Props, Inc., v. Rio Int'l Interlink,* 284 F. 3d 1007, 1022 (9th Cir. 2002)) (public policy favoring disposition of cases on their merits is not enough to preclude the imposition of default judgment). Defendant's failure to answer the "Complaint makes a decision on the merits impractical, if not impossible." *Id.* at *3 (citing *Pepsi Co., Inc.,* 238 F. Supp. 2d at 1177). Here, Snappers failed to file an answer. This made a decision on the merits impossible.

    C.    <u>Damages</u>

    26.    The EEOC is statutorily authorized pursuant to Title VII of the Civil Rights Act to seek back pay, compensatory and punitive damages. *See* 42 U.S.C. §1981a(a)(1). An award of compensatory and punitive damages is warranted as the Claimants experienced pain and suffering resulting from the harassment, retaliation and/or constructive discharge that was perpetrated by Snappers through Michael Wenzel and Troy Wenzel. An award of back pay is also an appropriate remedy to make Claimants whole for damages they incurred after their unlawful termination from Snappers.

    1.    <u>Back Pay with Prejudgment Interest</u>

    27.    An award of back pay is appropriate to advance "Congress' intent to make 'persons whole for injuries suffered through past discrimination'" *Price v. Stevedoring Servs. of Am., Inc.,* 697 F.3d 820, 837 (9th Cir. 2012) (citing *Caudle*

*Bristow Optical Co.,* 224 F.3d 1014, 1020 (9th Cir. 2000), *as amended on denial of*

*reh'g* (Nov. 2. 2000)).

28.    "Back pay is calculated by subtracting the actual wages a discharged

employee earned subsequent to termination from the amount the employee would

have earned absent the employer's discriminatory conduct." *E.E.O.C. v. Sunfire*

*Glass, Inc.,* No. CV–08–1784–PHX–LOA, 2009 WL 976495, at \*11 (D. Ariz. Apr.

10, 2009) (citing *Gotthardt v. Nat'l R.R. Passenger Corp.,* 191 F.3d 1148, 1158

(9th Cir. 1999); *Edwards v. Occidental Chem. Corp.,* 892 F.2d 1442, 1449 (9th

Cir. 1990) and *Sias v. City Demonstration Agency,* 588 F.2d 692, 696 (9th Cir.

1978)).

29.    Back pay is not subject to the statutory caps on compensatory and

punitive damages. *Lutz v. Glendale Union High Sch.,* 403 F.3d 1061, 1068-69 (9th

Cir. 2005); 42 U.S.C. §1981a(b)(2).

30.    Instead, back pay remains an equitable remedy to be awarded by the

district court in its discretion. *See Albermarle Paper Co. v. Moody*, 422 U.S. 405,

415-16 (1975); *Lutz*, 403 F.3d at 1069.

31.    Back pay awards are to be calculated "from the date of the

discriminatory act until the date of the final judgment." *Kraszweski v. State Farm*

*Gen. Ins. Co.,*912 F.2d 1182, 1184 (9th Cir. 1990).

32.    An award of "prejudgment interest on back pay award is appropriate."

*Domingo v. New England Fish Co.*, 727 F.2d 1429, 1446 (9th Cir. 1984); *see*

*United States v. Bell*, 602 F.3d 1074, 1084 (9th Cir. 2010), as amended by 734

F.3d 1223 (9th Cir. 2013) (noting that "a monetary award does not fully

compensate for an injury unless it includes an interest component").

33.    Upon review of the Declaration of Jessica Root, the Court finds that a

back pay award of $11,100, plus prejudgment interest of $1,087.86, are reasonable.

34.    Upon review of the Declaration of Nicole Garrett, the Court finds that

a back pay award of $13,170, plus prejudgment interest of $709.66, are reasonable.

35.    Upon review of the Declaration of Michelle Edwards, the Court finds

that a back pay award of $23,960, plus prejudgment interest of $1,608.22, are

reasonable.

36.    Upon review of the Declaration of Adrienne Akin, the Court finds that

a back pay award of $3,422, plus prejudgment interest of $244.79, are reasonable.

37.    The Court awards a total of $51,652.00 for back pay and $3,650.53

for prejudgment interest.

    2.  <u>Statutory Cap Should be Awarded to Claimants for Compensatory and Punitive Damages</u>

38.    The claimants suffered substantial emotional distress because of the

sexual harassment, retaliation and/or constructive discharge they experienced.

39.     A court may award compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." 42 U.S.C. §1981a(b)(3)(A). A claimant's testimony alone may be sufficient to support an award of compensatory damages for emotional harm. *Chalmers v. City of Los Angeles,* 762 F.2d 753, 761 (9th Cir. 1985) (affirming compensatory damages based upon plaintiff's testimony).

40.     The Ninth Circuit upheld awards of substantial damages based solely on the victim's testimony and circumstantial evidence. *Zhang v. Am. Gem. Seafoods, Inc.,* 339 F.3d 1020, 1040-41 (9th Cir. 2003) (affirming §1981 emotional distress damages of $223, 155 or $123,155 solely on plaintiff's testimony about being hurt and humiliated by the damage to his reputation caused by discrimination); *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 510-14 (9th Cir. 2000) (upheld $1,000,000 compensatory emotional distress damages for retaliatory discharge of employee who complained of sex discrimination).

41.     Punitive damages are available where the employer engaged in conduct with "reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. §1981a(b)(1).

42.    Egregious misconduct is not required to justify punitive damages. *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 535-36 (1999). The standard is whether the employer had "at least discriminate[d] in the face of a perceived risk that its actions will violate federal law." *Id.*

43.    The Supreme Court and the Ninth Circuit have noted that the "reprehensibility of the defendant's conduct" is the most important element in evaluating the appropriateness of punitive damages. *Arizona v. ASARCO, LLC,* 773 F.3d 1050, 1054 (9th Cir. 2014). The Ninth Circuit has reiterated that "'intentional discrimination' is a 'serious affront to personal liberty' and should be considered high on the reprehensibility scale' for purposes of assessing punitive damages. *Zhang,* 339 F.3d at 1043 (upholding a $2.6 million punitive damages award in a §1981 racial discrimination case); *see also Hemmings v. Tidyman's, Inc.,* 285 F.3d 1174, 1198-99 (9th Cir. 2002) (concluding that district court erred in not awarding punitive damages when a jury had concluded that defendant was aware of antidiscrimination laws and acted in the fact of this awareness).

44.    Upon review of the declarations of the Claimants outlining the substantial emotional distress they suffered because of the sexual harassment, this Court finds that an award of $25,000 per claimant for compensatory damages is warranted, giving a total of $100,000 for compensatory damages.  Since Defendant's owner was directly responsible for inflicting and condoning the sexual

harassment, this Court further finds that an award of $25,000 per claimant for punitive damages is warranted, giving a total of $100,000 for punitive damages. *See* 42 U.S.C. §1981a(b)(3)(A).

## IV.   CONCLUSION

IT IS HEREBY RECOMMENDED that Default Judgment be GRANTED in favor of Plaintiff EEOC and against Defendant Pacific Fun Enterprises LLC dba Snappers Sports Bar and Grill, dba Snap-pette Beach and Liquor Store.

The Court finds that Plaintiff EEOC should be awarded $100,000.00 for compensatory damages, $100,000.00 punitive damages, and $51,652.00 for back pay.  The total of these amounts is $251,652.00.

The Court finds that Plaintiff EEOC should also be awarded prejudgment interest in the amount of $3,650.00 for a total amount of **$255,302.53**.

IT IS FOUND AND SO RECOMMENDED.

Dated:  Honolulu, Hawaii, January 7, 2020.



/s/ Rom A. Trader
Rom A. Trader
United States Magistrate Judge

---

Civ. No. 17-00482 ACK-RT; *U.S. Equal Employment Opportunity Commission v. Pacific Fun Enterprises, LLC, et al.*; Second Amended Findings and Recommendation to Grant Plaintiff's Motion for Default Judgment Against Defendant Pacific Fun Enterprises LLC